## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | |
|---|---|
| **SORAYA DIASE COFFELT, JOHN CANEGATA AND RONALD CHARLES,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | **Civil Action No. 2014-025** |
| ) | |
| **CAROLINE F. FAWKES, IN HER OFFICIAL CAPACITY AS SUPERVISOR OF ELECTIONS FOR THE VIRGIN ISLANDS AND GOVERNMENT OF THE VIRGIN ISLANDS,** ) | |
| ) | |
| **Defendants.** ) | |

**Attorneys:**
**Andrew C. Simpson, Esq.,**
St. Croix, U.S.V.I.
 *For the Plaintiffs*

**Carol Thomas-Jacobs, Esq.,**
St. Thomas, U.S.V.I.
 *For the Defendants*

## <u>MEMORANDUM OPINION</u>

**Lewis, Chief Judge**

 THIS MATTER comes before the Court on Plaintiffs' "Motion for Permanent Injunction and Memorandum of Law in Support Thereof" (Dkt. No. 20), Defendants' Opposition thereto (Dkt. No. 23), and Plaintiffs' Reply (Dkt. No. 24). A hearing on Plaintiffs' Motion was held on June 27, 2014. For the reasons discussed below, the Court will deny Plaintiffs' Motion for a permanent injunction and enter judgment for Defendants.

## I.  INTRODUCTION

Plaintiffs seek to permanently enjoin the Office of the Supervisor of Elections ("Supervisor of Elections") from disqualifying the team of Soraya Diase Coffelt, a "No-Party" candidate, and her Republican running mate, John Canegata, from running as Independent/No-Party ("Independent") candidates for governor and lieutenant governor, respectively, in the November 4, 2014 general election. Plaintiffs further seek a declaration that Defendants' earlier decision to disqualify them under Title 18 V.I.C. § 342a is ineffective.

In support of their position, Plaintiffs contend that Title 18 of the Virgin Islands Code, which governs elections, "does not prohibit members of political parties from running as independent or 'no party' candidates," and therefore, "there is no statutory basis to conclude that their nomination papers were defective." (Dkt. No. 20 at 8). According to Plaintiffs, a contrary reading of the relevant statutory provisions would violate both the prohibition against political tests in the Revised Organic Act of 1954, 48 U.S.C. § 1561, and the First and Fourteenth Amendments to the United States Constitution.

Defendants argue, on the other hand, that Plaintiffs' contention is "contrary to the plain language" of the relevant provisions of Title 18 (Dkt. No. 23 at 8), and that "Canegata cannot run as an Independent/No-party candidate in the general election when he is in fact registered as a Republican" (*id.* at 4). Alternatively, Defendants argue that, to the extent that the relevant statutory provisions are ambiguous, the Court should give deference to the Supervisor of Elections' interpretation of those provisions, because that interpretation "is based on a permissible and reasonable construction of the statute." (*Id.* at 13) (citing *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 843–44 (1984)). Defendants conclude by maintaining that their interpretation of Title 18 does not violate either the Revised Organic Act or the United States Constitution. (*Id.* at 13–19).

2

The Court finds that the plain language of the relevant statutory provisions of Title 18 does not address whether a registered and enrolled member of a political party may run in the general election as an Independent candidate. Thus, the Court cannot resolve the question presented by relying on the unambiguous intent of the Virgin Islands Legislature. However, the Court finds that the Supervisor of Elections' conclusion that registered and enrolled party members may not run as Independent candidates in the general election is worthy of respect because of its persuasive value. The Court further finds that the Supervisor of Elections' interpretation of the relevant statutory provisions does not violate either the Revised Organic Act or the United States Constitution. Accordingly, the Court will give deference to the agency's interpretation of the relevant provisions of Title 18; deny Plaintiffs' Motion for a permanent injunction; and enter judgment for Defendants.[1]

## II. BACKGROUND

### A.     Procedural History

By Complaint filed on May 30, 2014, Plaintiffs Soraya Diase Coffelt ("Coffelt"), John Canegata ("Canegata"), and Ronald Charles ("Charles") initiated this action against Defendants Caroline Fawkes, in her official capacity as Supervisor of Elections for the Virgin Islands, and the Government of the Virgin Islands. (Dkt. No. 1). In their Complaint, Plaintiffs requested "injunctive relief enjoining the Defendants and all others acting by, through or in concert with her [sic], from disqualifying them from nomination or election in the November 4, 2014 general election[.]" (Dkt. No. 1 at 9, ¶ A). Plaintiffs also requested declaratory relief that "Coffelt and Canegata have met the requirements of 18 V.I.C. § 381 for placement on the ballot for the

---

[1] With the Court's denial of Plaintiffs' Motion for a permanent injunction and the entry of judgment for Defendants, the Court will vacate the outstanding Temporary Restraining Order ("TRO") (Dkt. No. 27), and the Court's June 6, 2014 Memorandum Opinion supporting the entry of the TRO (Dkt. No. 17).

November 4, 2014 general election as candidates for governor and lieutenant governor, respectively[.]" (*Id.* at ¶ B). Alternatively, Plaintiffs requested a declaration that Title 18 V.I.C. § 342a—a statutory provision upon which their disqualification was based—is unconstitutional as applied and in violation of their rights under the Revised Organic Act and the United States Constitution. (*Id.* at ¶ C).

Together with the Complaint, Plaintiffs filed a motion for a temporary restraining order. (Dkt. No. 2). In response to this Court's Order, Defendants filed their opposition to the motion on June 2, 2014 (Dkt. No. 11), and the Court held a hearing on Plaintiffs' motion on June 3, 2014.[2]

By Memorandum Opinion and Order issued on June 6, 2014, the Court entered a Temporary Restraining Order ("TRO") enjoining Defendants from disqualifying, pursuant to Title 18 V.I.C. §§ 342 and 342a, the nomination of Plaintiffs Coffelt and Canegata as candidates for governor and lieutenant governor, respectively, in the November 4, 2014 general election. (Dkt Nos. 16, 17). The TRO rendered Defendants' earlier decision to disqualify Plaintiffs Coffelt and Canegata ineffective for such time as the Order remained in place. (Dkt. No. 16). Pursuant to Federal Rule of Civil Procedure 65(b), the TRO was entered for fourteen days, and remained in effect through June 20, 2014.

In conjunction with the entry of the TRO, and as agreed at the hearing on June 3, 2014, the Court set a briefing schedule for Plaintiffs' Motion for Permanent Injunctive Relief and scheduled a hearing on the Motion for June 27, 2014. (Dkt. No. 18). On June 18, 2014, the Court, for good cause, extended the TRO, *sua sponte*, for an additional fourteen days, through

---

[2] In their initial motion, Plaintiffs also requested a preliminary injunction. (Dkt. No. 2). As discussed at the hearing held on June 3, 2014, the Court adjudicated only Plaintiffs' request for a temporary restraining order. By agreement of the parties at the hearing, the next stage of briefing proceeded directly to the instant adjudication of the merits of a permanent injunction.

July 4, 2014. (Dkt. No. 22). Plaintiffs' Motion for a permanent injunction was fully briefed on June 24, 2014, and the Court held a hearing on the Motion on June 27, 2014. Pursuant to the parties' consent, the Court extended the TRO on July 4, 2014 for an additional fourteen days, through July 18, 2014, in order to allow the Court sufficient time to render its opinion on Plaintiffs' Motion for a permanent injunction. (Dkt. No. 27).

## B.   Factual Background

Plaintiffs Coffelt and Canegata seek to run as Independent candidates on a joint ticket for governor and lieutenant governor of the Virgin Islands, respectively, in the November 4, 2014 general election. Plaintiff Coffelt is not a registered member of a political party. (Dkt. No. 1 at ¶ 1; Dkt. No. 12-1 at 8). Plaintiff Canegata is a registered and enrolled member of the Republican party. (Dkt. No. 1 at ¶ 2; Dkt. No. 12-2 at 6).[3]

On May 23, 2014, Coffelt—through a representative—filed a nomination paper[4] with the Office of Supervisor of Elections seeking to run for governor with Canegata as her running mate. (Dkt. No. 12-1; Dkt. No. 1 at ¶ 13; Dkt. No. 11 at 2). On May 27, 2014, Canegata filed his nomination paper to run as lieutenant governor on the same ticket as Coffelt. (Dkt. No. 12-2; Dkt. No. 1 at ¶¶ 13–17). Plaintiff Charles is one of the individuals who signed Plaintiff

---

[3] The Republican party is not holding a 2014 primary election for the gubernatorial race, nor will there otherwise be a Republican party-sponsored ticket in that race. There will, however, be a 2014 Republican primary for the election of party officers, in which Plaintiff Canegata—the current Chair of the Republican party, *see* http://www.vivote.gov/content/Office-Supervisor-Testimonies (last visited July 7, 2014)—is running for re-election. (Dkt. No. 1 at ¶ 24).

[4] Throughout their Complaint, Plaintiffs refer to the documents which Coffelt and Canegata filed as "nomination petitions." However, under the Virgin Islands Code, the term "nomination petition" refers to a document filed by a candidate seeking to run in a political party's primary, and the term "nomination paper" refers to a document filed by a candidate seeking to run outside of the political party primary process. *See* 18 V.I.C. §§ 344, 381–84. At the hearing on Plaintiffs' motion for a temporary restraining order, the parties agreed with the Court's interpretation and, in their respective filings for the instant Motion, the parties recognize this distinction. (See Dkt. Nos. 20, 23, 24).

Canegata's nomination paper as a qualified elector. (Dkt. No. 12-2 at 2).

On May 27, 2014, Plaintiffs Coffelt and Canegata each received a "Notice of Defect" from the Supervisor of Elections. The Notice of Defect addressed to Coffelt states, in pertinent part:

> PURSUANT TO TITLE 18 SECTION 411 YOU ARE HEREBY NOTIFIED THAT YOUR NOMINATION PETITION/PAPER WAS FOUND TO BE DEFECTIVE. THE REASON FOR THE DEFECT:
>
> **PURSUANT TO VIC TITLE 18, CHAPTER 17, § 342a – Prohibition against persons registered to a political party running as a no-party or independent candidate.**
>
> **<u>THE REQUIRED RUNNING MATE MUST BE OF LIKE INDEPENDENT PARTY IN ORDER TO BE AN ELIGIBLE CANDIDATE FOR GOVERNOR – VIC 18 SECTION 342(A).</u>**

(Dkt. No. 1-2).  The Notice of Defect addressed to Canegata states, in pertinent part:

> PURSUANT TO TITLE 18 SECTION 411 YOU ARE HEREBY NOTIFIED THAT YOUR NOMINATION PETITION/PAPER WAS FOUND TO BE DEFECTIVE. THE REASON FOR THE DEFECT:
>
> **<u>AS A REGISTERED MEMBER OF THE REPUBLICAN PARTY YOU HAVE FILED A NOMINATION PAPER AS A LIEUTENANT GOVERNOR CANDIDATE WITH A NO PARTY CANDIDATE WHICH IS IMPERMISSIBLE UNDER THE LAW.</u>**

(Dkt. No. 1-1).

On May 30, 2014, Plaintiffs filed their Complaint, challenging the Supervisor of Elections' interpretation of the applicable law as it pertains to Plaintiffs Coffelt and Canegata's eligibility to run as Independent candidates on a joint ticket in the 2014 gubernatorial race.

## III.   APPLICABLE LEGAL PRINCIPLES

An analysis of a motion for permanent injunctive relief considers whether: "(1) the moving party has shown actual success on the merits; (2) the moving party will be irreparably injured by the denial of injunctive relief; (3) the granting of the permanent injunction will result

in even greater harm to the defendant; and (4) the injunction would be in the public interest." *Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001) (citing *ACLU v. Black Horse Pike Reg'l Bd. of Educ.*, 84 F.3d 1471, 1477 nn.2–3 (3d Cir. 1996)). The Third Circuit has noted that "[o]f primary importance, a party seeking an injunction must show that there is some legal transgression that an injunction would remedy." *In re Diet Drugs*, 369 F.3d 293, 307 (3d Cir. 2004). In other words, "a party seeking a permanent injunction must 'succeed on the merits.'" *Id.* at n.7 (3d Cir. 2004) (quoting *Temple Univ. v. White*, 941 F.2d 201, 215 (3d Cir. 1991)); *see also Ciba-Geigy Corp. v. Bolar Pharm. Co.*, 747 F.2d 844, 850 (3d Cir. 1984) ("In deciding whether a permanent injunction should be issued, the court must determine if the plaintiff has actually succeeded on the merits (i.e. met its burden of proof). If so, the court must then consider the appropriate remedy.") (citing *Evans v. Buchanan*, 555 F.2d 373 (3d Cir. 1977)). If a court finds that a party requesting a permanent injunction has succeeded on the merits, the court considers whether "the moving party will be irreparably injured by the denial of injunctive relief"; "the granting of the permanent injunction will result in even greater harm to the defendant"; and "the injunction would be in the public interest." *Shields*, 254 F.3d at 482.[5]

In analyzing the merits of this case, the Court is called upon to interpret various provisions of the Virgin Islands Elections Code. In *Chevron, U.S.A., Inc. v. NRDC*, the Supreme Court concluded that, under appropriate circumstances, courts should defer to an agency's interpretation of the statute it administers. 467 U.S. 837, 843–44 (1984). Under *Chevron*, the first question a court considers when it "reviews an agency's construction of the statute which it administers," is "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the

---

[5] Because, as discussed below, the Court finds that Plaintiffs have not succeeded on the merits, the Court will not address the remaining factors.

agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43 (footnote omitted). If a court finds that "Congress has not directly addressed the precise question at issue," and the statute is "silent or ambiguous with respect to the specific issue," the court must ask whether the agency's interpretation "is based on a permissible construction of the statute." *Id.* at 843.

"Where *Chevron* deference is inappropriate, a court may instead apply a lesser degree of deference," known as *Skidmore* deference. *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 295–96 (3d Cir. 2012) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)). Under *Skidmore*, courts "accord the [agency's] interpretation a measure of deference proportional to the 'thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.'" *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2168–69 (2012) (quoting *United States* v. *Mead Corp.*, 533 U. S. 218, 228 (2001) (quoting *Skidmore*, 323 U. S. at 140 (1944))).

With these principles in mind, the Court will first address the statutory construction issues and then turn to the constitutional issues.

## III.   DISCUSSION

The "precise question at issue" in this case, *Chevron*, 467 U.S. at 842, is whether a registered and enrolled member of a political party can run for public office in the general election as an Independent candidate. Plaintiffs argue that they should succeed on the merits because there is no statutory basis for prohibiting such a candidacy. (Dkt. No. 20 at 8). The Court disagrees.

The Court finds that the Virgin Islands Legislature has not directly addressed the precise question presented; that Title 18 is "silent or ambiguous" with respect to this issue; and that the Supervisor of Elections' interpretation of Title 18 is sufficiently persuasive for the Court to defer

to it under *Skidmore*. The Court further finds that the Supervisor of Elections' interpretation does not violate either the Revised Organic Act or the United States Constitution. Accordingly, the Court will uphold the Supervisor of Elections' interpretation of Title 18 as prohibiting registered and enrolled members of political parties from running for public office in the general election as Independent candidates.

## A.     Nomination for Public Office

The parties agree that in the Virgin Islands there are two distinct avenues through which individuals can be nominated to run for public office in the general election. The relevant sections of Title 18 are found primarily, although not exclusively, in Chapter 17. Subchapter I of Chapter 17 ("Subchapter I") contains statutory provisions governing the nomination of candidates through the political party primary election process. Subchapter II of Chapter 17 ("Subchapter II") contains statutory provisions governing the nomination of candidates who are not running in party primaries, but who are running instead as either representatives of political bodies or as "Independent."

### 1.     Subchapter I

Political parties nominate their candidates for public office at primary elections held under the provisions of Title 18. 18 V.I.C. § 301(a). Only registered and enrolled members of political parties may vote or run for nomination for public office in the party's primary elections. 18 V.I.C. §§ 302; 344(a).[6] Political bodies may not nominate their candidates for public office at primary elections held under the provisions of Title 18. 18 V.I.C. § 301(b).[7]

---

[6] Any qualified elector may register to vote and, if he or she chooses, enroll in and designate a political party at the time of registration, or on a later date. 18 V.I.C. §§ 91, 100, 108. A "qualified elector" is a person who meets the qualifications for voting under Virgin Islands Law, or who will meet such qualifications before the next election by virtue of continued residence in his or her election district. 18 V.I.C. § 1; *see also* 18 V.I.C. §§ 261–64.

Under Subchapter I, in order for a person's name to be placed on a political party's primary ballot as a candidate for public office, a "nomination petition" must be filed on the person's behalf, pursuant to Title 18 V.I.C. § 344. Each signer of a nomination petition is required to declare in the petition that the signer is a registered and enrolled member of the political party designated in the petition. 18 V.I.C. § 345(b)(1).

The Elections Code makes clear that "all candidates of political parties . . . shall be nominated . . . at primary elections . . . and in no other manner." 18 V.I.C. § 342. Further, once a person files a nomination petition to run for public office, he or she "must run as a candidate consistent with [his or her] political party designation . . . at the time of the filing of the nomination petition[.]" 18 V.I.C. § 342a.

Based on the foregoing, it is clear that Subchapter I provides a distinct and exclusive path for political parties to nominate candidates to run for public office in the general election—a path that is foreclosed to non-party members and political bodies.

## 2.    Subchapter II

"In addition to party nominations made at primaries," a candidate may be nominated for public office if a "nomination paper" is filed on his or her behalf, pursuant to the provisions of Subchapter II. 18 V.I.C. § 381(a). The signers of the nomination paper need only be "qualified electors." 18 V.I.C. § 381(c). Thus, unlike in the political party primary process, whether one is enrolled as a member of a political party is of no consequence for purposes of signing a nomination paper.

---

[7] A "political body" is a "political group which is not a political party but which has nominated candidates for at least two public offices by nomination papers under Subchapter II of Chapter 17 . . . ." 18 V.I.C. § 301(b).

The law further provides that the nomination paper must "specify . . . the name or appellation, if any, of the political body" the candidate represents. 18 V.I.C. § 384(a)(1).[8] The nomination paper cannot state that the candidate represents a political party, nor use words that are "deceptively similar" to the name of a political party. 18 V.I.C. § 384(b). If the nomination paper does not specify that the candidate represents a political body, the candidate shall be "designated as 'Independent'" on the ballot at the general election. 18 V.I.C. § 384(c).

Thus, Subchapter II makes clear that there are only two options for a candidate running for public office outside of the party primary process—run as a representative of a political body, or be designated as "Independent." Such a candidate is foreclosed from representing a political party.

### 3.    Section 410(b)

Outside of Subchapters I and II, but nonetheless related to the nomination process is Title 18 V.I.C. § 410, which is found in Subchapter III of Chapter 17. Specifically, section 410(b) provides that, "[i]n any general election year, a person may file either a nomination petition pursuant to section 344 of this chapter or a nomination paper pursuant to subchapter II, but not both." Thus, although section 381 in Subchapter II provides that the nomination process through the filing of nomination papers is "[i]n addition to the party nominations made at primaries," the law prohibits the dual filing of nomination petitions and nomination papers. 18 V.I.C. § 410(b).[9]

---

[8] The candidate cannot represent a political body that has already filed a nomination paper for the same office, nor use words that are "deceptively similar" to such a political body. 18 V.I.C. § 384(b).

[9] Recognizing that Canegata filed a nomination petition in connection with his candidacy for chair of the Republican party and a nomination paper in connection with his candidacy for lieutenant governor—seemingly in violation of section 410(b)—Plaintiffs argued at both hearings that the most reasonable interpretation of section 410(b) is that it precludes a person from filing a nomination petition and a nomination paper *for the same office* in the same year, because section 410(b) refers to "nomination petition" and "nomination paper" in the *singular*.

**B.     Title 18 Does Not Speak Directly to the Precise Question at Issue**

The parties do not dispute that the avenue to nomination for public office through the political party primary process under Subchapter I is restricted, in all respects, to registered and enrolled members of political parties. Similarly, there is no dispute that Subchapter I excludes political bodies and Independent candidates from all aspects of participation in the party primary process. Further, it is undisputed that the avenue to nomination for public office under Subchapter II includes political bodies and Independent candidates. However, the "precise question at issue" in the case remains—whether a registered and enrolled member of a political party can run for public office in the general election as an Independent candidate under Subchapter II.

"Regardless of whether [a court] applies *Chevron* or *Skidmore* deference," the court must first "determine whether [the relevant statute] is ambiguous." *Hagans*, 694 F.3d at 295 ("We conduct this ambiguity analysis as a matter of statutory interpretation which is necessarily antecedent to our deference inquiry because we need reach the deference question only if we find

---

(Dkt. No. 20 at 5–6; Dkt. No. 24 at 12–13). In support of their argument, Plaintiffs noted that it is possible that a person may run for more than one office in the same year, thus leaving open the possibility that multiple nomination petitions (rather than only one) may be filed in a given year. For example, an individual could run for both governor and chair of a political party in the same year, both of which require the filing of nomination petitions. *See* 18 V.I.C. §§ 7, 344. Thus, Plaintiffs reasoned that the prohibition in section 410(b) must apply only to nominations for the same office.

However, pursuant to the Virgin Islands Code, "words importing the singular include and apply to several persons, parties, or things" and "words importing the plural include the singular," unless the context requires a different interpretation. 1 V.I.C. § 41; *see also In re Kaiser Aluminum Corp.*, 456 F.3d 328, 337 (3d Cir. 2006) ("As a general matter of statutory construction, the singular form of a word 'include[s] and appl[ies] to several persons, parties, or things' 'unless the context indicates otherwise.'") (quoting 1 U.S.C. § 1) (alterations in original). Here, the context does not "require[] a different interpretation," 1 V.I.C. § 41, or "indicate[] otherwise," *Kaiser*, 456 F.3d at 337. Accordingly, the Court finds that section 410(b) prohibits an individual from filing a nomination petition and a nomination paper in the same election year, regardless of whether the documents are filed for the same office.

the statutory language is ambiguous.") (citation omitted). Accordingly, the inquiry under either *Chevron* or *Skidmore* begins by asking "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842; *Hagans*, 694 F.3d at 295. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43 (footnote omitted).

To determine whether the legislature has "directly address[ed] the precise question at issue," courts consider the "plain language of the statute" and utilize "traditional tools of statutory construction." *La. Forestry Ass'n v. Sec'y of United States DOL*, 745 F.3d 653, 670 (3d Cir. 2014) (citing *Chevron*, 467 U.S. at 843 n.9); *see also United States v. Geiser*, 527 F.3d 288, 292 (3d Cir. 2008) ("At step one, we consider the text and structure of the statute in question.") (citing *Zheng v. Gonzalez*, 422 F.3d 98, 120 (3d Cir. 2005)).

As discussed below, the plain language of the relevant provisions of Title 18 neither expressly *permits* registered and enrolled members of political parties to run as Independent candidates, nor expressly *prohibits* them from so running. Thus, Title 18 does not speak directly to the precise question at issue.

### 1.      Subchapter I

In describing the process of nominating candidates through political party primary elections, Subchapter I does not provide a clear answer to the question at issue. Admittedly, the title of section 342a—"*Prohibition against persons registered to a political party running as a no-party or independent candidate*"—appears to provide such an answer. However, pursuant to the Virgin Islands Code, the "descriptive headings or catchlines, other than the section numbers contained therein, immediately preceding the text of individual the sections of this Code . . . do[] not constitute part of the law." 1 V.I.C. § 44.  Accordingly, the Court must look to the text of section 342a to discern the meaning of this provision.

13

Section 342a provides:

> Any person running for public office must run as a candidate consistent with the political party designation under which the candidate is registered at the time of the filing of the nomination petition, whether the political party designation indicates an affiliation with a political party as defined in section 301 or otherwise.

Thus, section 342a requires someone running as a candidate for public office to do so consistent with the candidate's political party designation "*at the time of the filing of the nomination petition* . . . ." 18 V.I.C. § 342a (emphasis added). However, despite its misleading title, section 342a does not address the circumstance of a registered and enrolled member of a political party on whose behalf a nomination petition for public office has not been filed. Accordingly, section 342a does not speak to the precise question at issue here—whether a registered and enrolled member of a political party is restricted to the party primary process in running for public office, or whether he or she is free to run for public office in the general election as an Independent candidate.[10]

Similarly, section 342 provides no answer. That section states, in pertinent part: "[A]ll candidates of political parties . . . for public offices shall be nominated . . . at primary elections held in accordance with the provisions of this title and in no other manner." 18 V.I.C. § 342. This section clearly precludes "candidates of political parties" from being nominated outside of the primary election process, i.e., by nomination papers. As noted earlier, in order for an individual to become a "candidate of a political party" for public office, a nomination petition must be filed

---

[10] Plaintiffs state in a footnote, without citing any authority, that section 342a "may be void for vagueness" because it "could be interpreted as prohibiting a candidate from adopting positions that are inconsistent with the political party's platform." (Dkt. No. 20 at 4 n.3). Plaintiffs argue that such an interpretation would "impose[] additional unconstitutional restraints on speech." (*Id.*). However, section 342a says nothing about running consistent with a political party's platform. The plain language refers only to running consistent with the "political party *designation* under which the candidate is registered." 18 V.I.C. § 342a (emphasis added). Accordingly, the Court rejects Plaintiffs' "void for vagueness" suggestion.

on his or her behalf. 18 V.I.C. § 344(a). Because section 342 speaks in terms of "candidates of political parties," and not "registered and enrolled members of political parties," it, too, does not address the precise question at issue here as to whether members of political parties—like "candidates of political parties"—are similarly restricted to the primary election process in running for public office.[11]

The Court thus finds that the plain language of the relevant provisions in Subchapter I does not express either an unambiguous intent to *permit* registered and enrolled members of political parties to run for public office in the general election as Independent candidates, or an unambiguous intent to *prohibit* them from so doing. Thus, in Subchapter I, the Virgin Islands Legislature has not "directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842.

### 2.     Subchapter II

Plaintiffs note that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (Dkt. No. 24 at 9) (quoting *Rusello v. United States*, 464 U.S. 16, 23 (1983)). In this vein, Plaintiffs argue that "[t]he deliberate use of language in subchapter I that is not used in subchapter II establishes that the legislature did not intend to require a member of a political party to run for office only through the method established in subchapter I." (*Id.* at 9–10). Specifically, Plaintiffs refer to the requirement in Subchapter I that a candidate be a member of a political party for his or her name to appear on that party's primary ballot, in contrast to the absence of a requirement in Subchapter II that a candidate *not* be a member of a political party to run for public office through the filing

---

[11] In other words, section 342 does not say that all "registered and enrolled members of political parties" seeking public office "shall be nominated . . . at primary elections held in accordance with the provisions of this title and in no other manner." It refers only to "candidates of political parties." 18 V.I.C. § 342.

of a nomination paper. (*Id.* at 10) (citing 18 V.I.C. § 344(a)).

Plaintiffs' proposition is an awkward one in that it seeks to create a presumption by contrasting the presence of a positive requirement with the absence of a negative restriction. Even if the Court were to credit Plaintiffs' strained logic, and deem noteworthy Subchapter II's lack of a provision explicitly prohibiting registered and enrolled members of political parties from running for public office through the filing of a nomination paper, that would not end the analysis. The Supreme Court has noted that "[a]n inference drawn from congressional silence certainly cannot be credited when it is contrary to all other textual and contextual evidence of congressional intent." *United States v. Vonn*, 535 U.S. 55, 65 (2002) (internal citation and quotation marks omitted). Here, Plaintiffs' assertion is contrary to the "textual and contextual evidence of [legislative] intent." *Id.*

As previously noted, in section 384, the Virgin Islands Legislature explicitly prohibited a candidate running for public office under Subchapter II from using words to describe the political body the candidate represents that are identical to that of a political party. 18 V.I.C. § 384(b). Indeed, the candidate is prohibited from using words that even resemble the name or abbreviation of a political party. *Id.* Thus, a candidate may not so much as suggest that his or her candidacy under Subchapter II is associated with a political party. This disassociation from political parties in Subchapter II is antithetical to Plaintiffs' assertion that there is a presumption that the Virgin Islands Legislature intended to allow registered and enrolled members of political parties to run as Independent candidates under Subchapter II.

Further, Subchapter II's default designation for a candidate is "Independent," thus presuming a non-affiliation with a political party. The Court finds that Subchapter II's imputation of the "Independent" designation on candidates is also at odds with Plaintiffs' contention that the Court should presume that the Legislature intended to allow political party

members to run for public office as Independent candidates under Subchapter II. To the contrary, as Defendants aptly note, section 384 "presumes that the candidate is Independent and imputes the Independent designation on the candidate." (Dkt. No. 23 at 8).

Based on the foregoing, the Court rejects Plaintiffs' argument that the *absence* of an explicit provision in Subchapter II that candidates running for public office through the filing of a nomination paper *cannot* be members of political parties is an indication of a presumption that the Virgin Islands Legislature intended to permit political party members to run for public office as Independents under Subchapter II. The explicit prohibition in Subchapter II against using language even resembling the name of a political party, coupled with Subchapter II's default "designation" of "Independent," suggests that Plaintiffs' contention is contrary to the "textual and contextual evidence of [legislative] intent" found in Subchapter II. *Vonn*, 535 U.S. at 65.

In sum, the Court finds no unambiguous intent in Title 18 regarding whether registered and enrolled members of political parties may run for public office as Independent candidates. Thus, the Virgin Islands Legislature has not "directly spoken to the precise question at issue," and the relevant statutory provisions are "silent or ambiguous" with respect to that issue. *Chevron*, 467 U.S. at 842–43.

## C.    Level of Deference

Because the Court has found that the relevant statutory provisions do not speak to the precise question at issue, the next step is to determine whether "*Chevron* deference is proper, or whether *Skidmore* instead provides the appropriate framework" for the analysis. *Hagans*, 694 F.3d at 297. When *Chevron* deference is applied, the agency's interpretation "governs if it is a reasonable interpretation of the statute—not necessarily the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009) (citing *Chevron*, 467 U.S. at 843–44). On the other hand, if *Skidmore*

17

deference is applied, the agency's interpretation warrants "respect proportional to its 'power to persuade.'" *Mead Corp.*, 533 U.S. at 235 (quoting *Skidmore*, 323 U.S. at 140). The Court will analyze each in turn.

### 1.    *Chevron* Deference

"An agency interpretation 'qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'" *George Harms Constr. Co. v. Chao*, 371 F.3d 156, 161 (3d Cir. 2004) (quoting *Mead Corp.,* 533 U.S. at 226–27). The Supreme Court has noted that "[d]elegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent." *Mead Corp.,* 533 U.S. at 227.

"[T]he ultimate question is whether *Congress* would have intended, and expected, courts to treat an agency's rule, regulation, application of a statute, or other agency action as within, or outside, its delegation to the agency of 'gap-filling' authority." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 175 (2007); *see also Mead Corp.,* 533 U.S. at 229 ("Congress . . . may not have expressly delegated authority or responsibility to implement a particular provision or fill a particular gap. Yet it can still be apparent from the agency's generally conferred authority and other statutory circumstances that Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law, even one about which 'Congress did not actually have an intent' as to a particular result.") (quoting *Chevron*, 467 U.S. at 845).

The Virgin Islands Legislature charged the Supervisor of Elections with the "duty" to "examine . . . nomination petitions, nomination papers or nomination certificates" and, in the

event that the Supervisor "determine[s] that a candidate for election or nomination does not meet the qualifications established by law for the office," to "disqualify such candidate . . . ." 18 V.I.C. §§ 4(b)(3); 411(a)–(b). Further, the Supervisor of Elections must "certify to the boards of elections, for primaries and elections, the names of candidates for all public and territorial offices . . . ." 18 V.I.C. § 4(b)(2).

Although it is apparent that the Supervisor of Elections' interpretation of Title 18 here "was promulgated in the exercise of [the authority]" granted to the Office by the Virgin Islands Legislature to examine Plaintiffs Coffelt and Canegata's nomination papers and determine their legal sufficiency, it is not readily apparent that, under *Chevron* and its progeny, the Virgin Islands Legislature delegated to the Supervisor of Elections "the authority . . . generally to make rules carrying the force of law" in the Supervisor's examination of nomination documents and actions taken thereon. *Mead Corp.,* 533 U.S. at 226–27.

In *Christ the King Manor, Inc. v. Sec'y United States HHS*, the Third Circuit held that the Secretary of the United States Department of Health and Human Services' interpretation of the Medicaid Act in approving or denying a "state plan amendment" is entitled to *Chevron* deference. 730 F.3d 291 (3d Cir. 2013). The Third Circuit reasoned that the Medicaid Act's express statement that "the Secretary must 'approve any plan which fulfills the conditions specified' in the statute," reflected Congress' delegation to the agency of the responsibility to "make interpretive decisions regarding which state plans satisfy the Act's requirements." *Id.* at 307 (quoting 42 U.S.C. § 1396a(b)). Similarly here, the Virgin Islands Legislature's grant of authority to the Supervisor of Elections includes the mandate to determine whether a candidate for election "meet[s] the qualifications established by law for the office." 18 V.I.C. § 411(b). As in *Christ the King*, this delegation of authority includes the responsibility "to make interpretive decisions regarding which [candidates] satisfy [Title 18's] requirements." 730 F.3d at 307.

However, the *Chevron* analysis does not end there, but instead is informed by a consideration of other factors. In reaching the conclusion in *Christ the King* that *Chevron* deference was appropriate, the Third Circuit relied in part on the Supreme Court's observation in discussing the deference due to the Centers for Medicare & Medicaid Services' interpretations of the Medicaid Act, that "the agency's approval 'carries weight,' especially when 'the language of the particular provision at issue . . . is broad and general, suggesting that the agency's expertise is relevant in determining its application.'" *Id.* at 306–07 (alteration in original) (quoting *Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 132 S. Ct. 1204, 1210 (2012)). The Third Circuit has also noted that "[t]he broad deference of *Chevron* is even more appropriate in cases that involve a 'complex and highly technical regulatory program,' such as Medicare, which 'requires significant expertise and entails the exercise of judgment grounded in policy concerns.'" *Robert Wood Johnson Univ. Hosp. v. Thompson*, 297 F.3d 273, 282 (3d Cir. 2002) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)). There is no question that the statutory schemes governing the administration of Medicaid and Medicare are considerably more broad, complex, and technical—and thus more reliant on agency expertise and policy judgment—than the statutory provisions in Title 18.[12]

Further, while mindful of the Supreme Court's statement in *Mead Corp.* that "a very good indicator of delegation meriting *Chevron* treatment [is] express congressional

---

[12] For example, both *Christ the King* and *Douglas* involved an agency interpretation of a statutory provision in the Medicaid Act requiring a State's Medicaid plan and amendments to:

> [P]rovide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . *as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area*.

42 U.S.C. § 1396a(a)(30)(A) (emphasis added).

authorizations to engage in the process of rulemaking or *adjudication* that produces regulations or rulings for which deference is claimed," 533 U.S. at 236 (emphasis added), both the Supreme Court and the Third Circuit have expressly rejected applying *Chevron* deference to informal interpretations of statutes. *See Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference.") (citations omitted); *Mercy Catholic Med. Ctr. v. Thompson*, 380 F.3d 142, 155 (3d Cir. 2004) (declining to apply *Chevron* deference to the Secretary of the Department of Health and Human Services' informal interpretive rule, which was issued "as an official instruction to fiscal intermediaries," and later published in the Federal Register, and noting that "agency interpretive guidelines do not rise to the level of regulation and do not have the effect of law.") (internal citation and quotation marks omitted); *Soltane v. US DOJ*, 381 F.3d 143, 148 n.4 (3d Cir. 2004) (noting that an "agency's informal interpretation of a *statutory* ambiguity does not merit *Chevron* deference) (citing *Mead Corp.*, 533 U.S. at 227–29); *George Harms Constr.*, 371 F.3d at 161 ("Informal agency interpretations are not binding but are entitled to respect under *Skidmore* deference to the extent they are persuasive.") (internal citation and quotation marks omitted).[13] Thus, in order to determine whether the Supervisor of Elections' interpretation of Title 18—in carrying out the Office's statutorily imposed duty to examine nomination documents and determine their legal sufficiency—is entitled to *Chevron* deference, an analysis of the process would be required to determine if it carries with it the necessary indicia of formality.

---

[13] "Informal adjudication is a residual category including all agency actions that are not rulemaking and that need not be conducted through 'on the record' hearings." *Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 361 n.37 (D.C. Cir. 1981).

While it appears, based on the record evidence presented here,[14] that the agency process used in disqualifying Plaintiffs Coffelt and Canegata did not rise to the degree of formality required for the "force of law" label to attach to the statutory interpretation that supported the disqualification decision, the Court need not decide that particular issue, or the overall question of whether *Chevron* deference applies. As discussed below, because the Court finds that the Supervisor of Elections' interpretation is persuasive under *Skidmore*, the Court will give deference to Defendants' interpretation of Title 18 without making a finding as to the applicability of *Chevron* deference. *See, e.g.*, *Del. Dep't of Natural Res. & Envtl. Control v. U.S. Army Corps of Eng'rs*, 685 F.3d 259, 285 n.25 (3d Cir. 2012) (noting that the parties disagreed with regard to "whether *Chevron* deference should attach," but that the court did not need to "settle th[e] debate," because "[a]t the least, *Skidmore* deference is due, and is sufficient to support the [agency's] action."); *Springfield, Inc. v. Buckles*, 292 F.3d 813, 818 (D.C. Cir. 2002) (noting that whether the court "follow[ed] *Chevron* or simply review[ed] the [agency's] statutory construction on the basis of *Skidmore* . . . [was] of no moment" because the persuasiveness of the agency's interpretation "le[d] . . . to the same result under either line of authority."); *Clifford v. U.S. Coast Guard*, 915 F. Supp. 2d 299, 310 (E.D.N.Y. 2013) ("However, the Court does not need to decide whether the informal adjudication by the Coast Guard is entitled to *Chevron* deference after *Mead* because even under *Skidmore*, the agency's decision should be upheld.") (citing *Buckles*, 292 F.3d at 818).

---

[14] Based on the record evidence before the Court, it appears that, in accordance with 18 V.I.C. § 411, the Supervisor of Elections examined Plaintiffs Coffelt and Canegata's respective nomination papers, issued notices of defect and, when the defect was not remedied, disqualified the team from nomination for election three days later. The Court notes that Title 18 does not require an "on the record hearing" for this type of defect. 18 V.I.C. § 411; *cf. Marsh*, 655 F.2d at 361 n.37.

2.      **Application of *Skidmore***

The "central question" the Court is "tasked with answering" when considering *Skidmore* deference is "whether the [agency's] interpretation is persuasive." *Hagans*, 694 F.3d at 304. The Supreme Court in *Skidmore* stated that "the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." 323 U.S. at 140.

"A court will afford *Skidmore* deference upon consideration of 'the thoroughness evident in [an agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" *Del. Dep't of Natural Res.*, 685 F.3d at 284 (alteration in original) (quoting *Skidmore*, 323 U.S. at 140); *see also Mead Corp.*, 533 U.S. at 228 ("The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances[,] . . . . produc[ing] a spectrum of judicial responses, from great respect at one end, to near indifference at the other.") (citations omitted).

The Third Circuit has held that "the most important considerations" under *Skidmore* are "whether the agency's interpretation 'is consistent and contemporaneous with other pronouncements of the agency and whether it is reasonable given the language and purpose of the Act.'" *Hagans*, 694 F.3d at 304 (quoting *Del. Dep't of Natural Res.*, 685 F.3d at 284). Thus, the Court turns to the Supervisor of Elections' interpretation of Title 18 while considering the *Skidmore* considerations listed above.[15]

---

[15] The Court notes that legislative history may be considered in a *Skidmore* deference analysis. *See Hagans*, 694 F.3d at 298 n.12 (citing *Cleary by Cleary v. Waldman*, 167 F.3d 801, 811–12 (3d Cir. 1999)). However, there is scant, if any, legislative history for the relevant statutory provisions in this case.

23

Defendants contend that Title 18 provides "two distinct and exclusive paths a candidate can use to get on the ballot for the general election" depending on whether the candidate is a "member of a political party or a political body/Independent." (Dkt. No. 23 at 6). If a member of a political party, Defendants maintain that the exclusive path is via a nomination petition under Subchapter I. If a political body/Independent, the exclusive path is via a nomination paper under Subchapter II.

There clearly are two "distinct" paths a candidate may take to the ballot for the general election under Subchapter I and Subchapter II. The question is whether the agency's interpretation that Subchapter I and Subchapter II constitute "exclusive" paths to the general election ballot—in that a registered and enrolled member of a political party is foreclosed from proceeding as an Independent under Subchapter II—"is reasonable given the language and purpose of Title 18." *See Hagans*, 694 F.3d at 304. The Court finds that the agency's interpretation is reasonable.

As discussed above, the path to the general election ballot under Subchapter I is exclusive to registered and enrolled members of political parties, and neither political bodies nor Independents may participate. *See* 18 V.I.C. §§ 301, 302, 344, 345(b)(1). On the other hand, Subchapter II provides the avenue for representatives of a political body, as well as individuals who are not representing political bodies, to run for public office. The individuals who are not representing political bodies—who also may not represent or purport to represent a political party or any entity with an appellation "deceptively similar" to the name of a political party—are designated as "Independent." *See* 18 V.I.C. § 384(b)–(c).

It is reasonable to conclude under the circumstances here that registered and enrolled members of a political party were not intended to be included among the individuals who can proceed as Independent candidates under Subchapter II. The Subchapter II candidate's inability

to represent a political party, or any entity with a name or appellation "deceptively similar" to that of a political party, together with the candidate's designation as "Independent," suggests that the existence of a membership relationship between the candidate and a political party was not intended. The Court is loathe to conclude that the designation of candidates as "Independent" was intended to be meaningless, as it most assuredly would be if someone so designated could nonetheless maintain membership in a political party.[16] The Court is also loathe to ignore the clear indication in section 384 that political party representation is forbidden under Subchapter II. The Court finds that it is reasonable to conclude from these two factors that Subchapter II was not intended to become an avenue through which members of political parties could proceed to the general election as Independents. Rather, as Defendants argue, the Court believes it is reasonable to conclude under the circumstances here that, in imputing the Independent designation on the candidate, section 384 "presumes that the candidate is Independent." (Dkt. No. 23 at 8). *See United States v. Cooper*, 396 F.3d 308, 313 (3d Cir. 2005) ("The Whole Act Rule instructs that subsections of a statute must be interpreted in the context of the whole enactment. Because 'statutory interpretation . . . is a holistic endeavor[,] . . . [a] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme.") (alterations in original) (quoting *United Sav. Ass'n of Tex. v. Timbers of Inkwood Forest Assocs.*, 484 U.S. 365, 371 (1988)).

Defendants rely on section 410(b) for further support of their interpretation. According to Defendants, section 410(b), which prohibits the filing of a nomination petition and nomination paper in the same year, when read in conjunction with section 342a, "reflect[s] the Legislature's intent to disallow the fusion of candidates for public office, solidif[ies] the dichotomy between

---

[16] As Defendants note, "[t]he designation of a candidate as Independent, Republican or Democrat under Virgin Islands law is not some ephemeral non-relational characterization but is based on the candidate's registration." (Dkt. No. 23 at 6).

the two Subchapters and further differentiate[s] the nomination process used by members of political parties and independents." (*See* Dkt. No. 23 at 11).[17] The Court agrees that section 410(b) provides further support for the reasonableness of Defendants' interpretation.

The Court will give deference under *Skidmore* to the Supervisor of Elections' construction of Title 18 in view of the persuasiveness of the interpretation. In this regard, the Court deems as significant the clearly exclusive nature of Subchapter I, as restricted to registered and enrolled party members; the prohibitions within Subchapter II against a candidate running as a representative of a political party, or using words deceptively similar thereto; Subchapter II's imputation of a designation as "Independent" on candidates that are not running on behalf of a political body; and the Virgin Islands Legislature's intent, as expressed in 410(b), to prohibit individuals running through both Subchapter I and Subchapter II in the same year. Based on these factors the Court finds that the Supervisor of Elections' statutory construction is thorough, valid, and reasonable under *Skidmore*. 323 U.S. at 140; *see also Cooper*, 396 F.3d at 313.[18]

---

[17] The Court notes Defendants' assertion in their Opposition that section 410(b) provides another ground for disqualifying Plaintiff Canegata, because he filed a nomination petition to run for chair of the Republican party and a nomination paper to run for lieutenant governor in the same year. (Dkt. No. 23 at 11) ("Since Canegata has already filed [a] nomination petition for Republican State Chair, he is disqualified from filing nomination papers for lieutenant governor."). Although it appears that Defendants are correct in this assertion, Plaintiff Canegata's dual filing of a nomination petition and a nomination paper was not the basis upon which the Supervisor of Elections relied in disqualifying Plaintiffs. There is a "bedrock principle of administrative law that judicial review of an agency's decision is limited to the rationale that the agency provides." *Konan v. AG of the United States*, 432 F.3d 497, 501 (3d Cir. 2005). However, the Supreme Court has noted that there are appropriate circumstances for upholding an agency's decision on other grounds. *See NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969); *Mass. Trustees of E. Gas & Fuel Assocs. v. United States*, 377 U.S. 235, 246–48 (1964). The Court need not pursue the "other ground" route, however, because the rationale advanced by the agency—that registered and enrolled members of political parties are prohibited from running for public office as Independent candidates—provides a sufficient basis upon which to uphold the agency's decision.

[18] In Plaintiffs' motion for a temporary restraining order, they asserted that "in Virgin Islands history, Governor Juan F. Luis, a member of the Independent Citizen's Movement party ran and

26

Having afforded deference under *Skidmore* to the Supervisor of Elections' interpretation of Title 18 as prohibiting registered and enrolled members of political parties from running for public office in the general election as Independent candidates, the Court now turns to Plaintiffs' Revised Organic Act and constitutional arguments.

**D.     Political Test**

Plaintiffs contend that the requirement for members of political parties to disaffiliate from their party before running for public office as Independents constitutes a "political test" that is impermissible under Section 3 of the Revised Organic Act, 48 U.S.C. § 1561. (Dkt. No. 20 at 10). The Court disagrees.

Section 1561 provides, in pertinent part:

> No political or religious test other than an oath to support the Constitution and the laws of the United States applicable to the Virgin Islands, and the laws of the Virgin Islands, shall be required as a qualification to any office or public trust under the Government of the Virgin Islands.

48 U.S.C. § 1561. The Court reads section 1561 as it is written—as prohibiting the imposition of political or religious tests as qualifications for any office or public trust. Notwithstanding

---

was elected with his running mate, Democrat, Henry Millin," and that, "in 1973, Republican governor Melvin Evans appointed Democrat [Athniel] Ottley as his lieutenant governor" to fill the vacant position. (Dkt. No. 2 at 7). Plaintiffs' assertion with respect to the Evans/Ottley team is inapt, as Plaintiffs have not indicated that either Governor Evans or Lieutenant Governor Ottley *ran* for office as an Independent while registered with a political party. With respect to the Luis/Millin candidacy, Plaintiffs and Defendants appeared to agree at the hearing on June 3, 2014, that Governor Luis and Lieutenant Governor Millin ran together as Independents, but there was no resolution with regard to their respective party registration during their candidacy. Recognizing that one of the *Skidmore* factors is consistency with earlier pronouncements, the Court notes that, even assuming that Juan Luis and Henry Millin were registered members of political parties when they ran for office as Independents in 1978, this ostensibly inconsistent application of the requirement at issue over thirty-five years ago, and prior to more recent amendments to the Elections Code, *see, e.g.*, 18 V.I.C. § 342a, would not change the Court's conclusion, discussed above, that the Supervisor of Elections' interpretation of Title 18 is reasonable and persuasive.

Plaintiffs' contention, they have failed to identify a political test for public office in the Virgin Islands.

Asserting that "[t]he ultimate political test is to require membership in—or non-membership in—a political party," Plaintiffs rely on two cases for their political test argument—both as "comparison cases." (Dkt. No. 20 at 10) (comparing *Canton v. Todman*, 367 F.2d 1005, 1008 (3d Cir. 1966) ("[C]ompelling an individual who is taking the first step toward, hopefully, becoming a member of the Virgin Islands Legislature, to swear that he will espouse *and pursue* the principles of a particular political party, indefinitely and without limit of time, might well be regarded as imposing a political test as a qualification to a public office under the Government of the Virgin Islands in violation of . . . the Revised Organic Act[.]")); (Dkt. No. 24 at 16–17) (comparing *City of Evansville v. Indiana*, 21 N.E. 267, 270 (Ind. 1889) (finding that conditioning employment on party membership, "prescribe[d] a political test," "contravene[d] the Constitution," and presented a "question so clear it . . . hardly seem[ed] necessary to cite authorities[.]") (citations omitted)). The Court finds that the factual predicates upon which the political test conclusions are based in *Canton* and *City of Evansville* are wholly inapposite to the circumstances here, and these cases are therefore not instructive as "comparison cases."

More instructive, and indeed on point, is the Tennessee Supreme Court's interpretation, over eighty-five years ago, of a clause in the state's Constitution prohibiting religious and political tests for public office that is very similar to the clause in the Revised Organic Act.[19] The Supreme Court of Tennessee upheld the legality of a statute—challenged on political test grounds—which provided that the composition of a five-member county commission could consist of no more than three members of the same political party. In so doing, the court stated:

---

[19]  The Tennessee Constitution provided that: "[N]o political or religious test, other than an oath to support the Constitution of the United States, and of this State, shall ever be required as a qualification to any office or public trust under this State." Tenn. Const. art. I, § 4.

> We do not think the statutory provision noted undertakes to require a political test as a qualification to the office of road commissioner of Hamblen County. It is merely prescribed that not more than three of said commissioners shall belong to the same political party. Any citizen, otherwise qualified, is eligible to this office, whether he be Democrat, Republican, Socialist, or without party alignment. To keep the commission as free as possible from political bias, it was enacted that it should not be filled with commissioners of one political faith. *No political test, however, was imposed as a qualification for a place on the commission. Political affiliation does not stand in the way of anyone seeking this office*.

*Marshall v. Burke*, 158 Tenn. 133, 138 (1928) (emphasis added).

Similarly here, "[p]olitical affiliation does not stand in the way of anyone seeking [public] office." *Id.* In the Virgin Islands, a candidate may choose to run for public office by enrolling in a political party and running in that party's primary; running as a representative of a political body; or running as an Independent candidate. The three paths to public office in the Virgin Islands, when viewed together, do not preclude an individual from running for, or holding office, based on any political test. Moreover, an individual may enroll in, or change his political party membership at any time, except within thirty days before an election and five days or fewer after an election. 18 V.I.C. §§ 91, 108(a). Thus, there simply is no political test imposed as a qualification for public office in violation of the Revised Organic Act. *See Marshall*, 158 Tenn. at 138.

In sum, Plaintiffs have failed to provide any credible support for their position that the requirement for members of political parties to disaffiliate from their party before running for public office as Independents constitutes an impermissible political test. There is nothing about this requirement that would preclude an individual—based on party affiliation—from running for public office, or that would require a candidate that emerged victorious from one of the three paths to public office to pass a "political test," in order to assume office. The requirement that a political party member disaffiliate from his party before running as an Independent is more in the

nature of a political choice, not an impermissible political test.[20] Accordingly, the Court finds that Plaintiffs' political test argument is without merit.

## E.    Constitutional Issues

Plaintiffs Coffelt and Canegata argue that the requirement for political party members to disaffiliate from their party before running for public office as Independents violates their First Amendment right, guaranteed through the Fourteenth Amendment, "to run for public office in an effort to advance their ideas for improving the lives of Virgin Islanders and . . . [their] right to do so freely by associating with each other in an effort to reach the broadest audience possible." (Dkt. No. 2 at 10).[21] Plaintiff Charles contends that the disaffiliation requirement restricts his "fundamental" right "to vote for the candidate of his choice and the right set forth in 18 V.I.C. § 381 to select a standard bearer." (*Id.*) (citing *Patriot Party v. Allegheny Cnty.*, 95 F.3d 253 (3d Cir. 1996)).

The Court finds no constitutional or statutory violations. Rather, the requirement that a member of a political party disaffiliate from his party—as late as the day he files his nomination paper—in order to run as an Independent candidate for public office in the general election is a reasonable, nondiscriminatory restriction, which is justified by the Virgin Islands' important

---

[20] Plaintiffs further argue that prohibiting registered and enrolled members of political parties from running for public office in the general election as Independents "punish[es]" candidates who 'fail' the political test by being members of a political party," because such individuals are "subjected to a burden that is not placed upon individuals of 'no party'"—namely, having to "survive" a primary election in order to run for public office in the general election. (Dkt. No. 20 at 11). Notwithstanding Plaintiffs' disregard for the benefits that come with "surviving" a political party primary—including the endorsement of the political party and the reflection of such endorsement on the general election ballot—Plaintiffs again fail to explain how this choice between reasonable alternative paths to public office constitutes the imposition of a "political test" as a "qualification" for office.

[21] Plaintiffs' constitutional arguments made in their motion for a temporary restraining order were incorporated by reference in their Motion for a permanent injunction. (Dkt. No. 20 at 12).

interest in regulating its elections. For the same reasons, Plaintiffs Coffelt and Canegata's resulting disqualification from candidacy does not violate Plaintiff Charles' constitutional rights.

It is well-established that "the First Amendment protects 'the freedom to join together in furtherance of common political beliefs.'" *Cal. Democratic Party v. Jones*, 530 U.S. 567, 574 (2000) (quoting *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214–15 (1986)). However, it is also beyond reproach that "States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (quoting *Burdick v. Takushi*, 504 U.S. 428, 433) (1992)) ("'As a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process.'") (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974))).[22] The Supreme

---

[22] Plaintiffs suggest that, in the face of a constitutional challenge, there is a "critical distinction" between the Virgin Islands' ability to regulate its elections and that of the fifty states that renders well-established constitutional jurisprudence inapt under the circumstances here. According to Plaintiffs this is because the Elections Clause of the U.S. Constitution has not been extended to the Virgin Islands by the Revised Organic Act, and further that Congress—through the Revised Organic Act—"set the time and manner, if not the place, for all elections in the territory." (Dkt. No. 24 at 14–15) (citing 48 U.S.C. §§ 1576, 1591, 1542). Plaintiffs' assertion is both legally and factually incorrect.

> The Elections Clause provides:
> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the places of chusing Senators.

U.S. Const. art. I, § 4, cl. 1. Thus, the Elections Clause speaks to the "times, places and manner" of elections for certain *federal* offices. The Supreme Court has noted that this "power is matched by state control over the election process for *state* offices." *Tashjian*, 479 U.S. at 217 (emphasis added); *see also Hayden v. Pataki*, 449 F.3d 305, 327 (2d Cir. 2005) ("[T]he states have the primary responsibility for regulating the times, places, and manner of conducting federal elections, and even more obviously for regulating elections to state office.") (citation and internal quotation marks omitted). Moreover, while it is true that the Revised Organic Act mandates certain requirements regarding elections, it is hardly the case that those requirements encompass the entirety of the rules governing time, place and manner that are necessary for the conduct of the elections process. Were that the case, there would be no need for the Elections Code that exists as part of Virgin Islands law. Thus, the Court rejects Plaintiffs' suggestion that well-

Court has noted that "[e]ach provision of these schemes, whether it governs the registration and qualification of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends." *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983).

To assess a plaintiff's claim that an election law is in violation of the plaintiff's First and Fourteenth Amendment associational rights, courts balance the "'character and magnitude' of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." *Twin Cities*, 520 U.S. at 358 (quoting *Burdick*, 504 U.S. at 434). When "those rights are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Burdick*, 504 U.S. at 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). However, when a state election law "imposes only modest burdens, . . . 'the State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions' on election procedures." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 452 (2007) (quoting *Anderson*, 460 U.S. at 788). There is no "bright line" test that "separates permissible election-related regulation from unconstitutional infringements on First Amendment freedoms." *Twin Cities*, 520 U.S. at 359 (citing *Storer*, 415 U.S. at 730).

1.      **Plaintiffs Coffelt and Canegata**

The Court turns first to the "character and magnitude" of the burden imposed on Plaintiffs Coffelt and Canegata's First and Fourteenth Amendment rights by the requirement that a member of a political party disaffiliate from his or her party before running for public office as an Independent candidate.

---

established constitutional jurisprudence does not apply under the circumstances here.

The parties do not dispute that, under the relevant statutory provisions, members of political parties may disaffiliate from their party as late as the day they file their nomination papers to run as Independents. In the same regard, candidates seeking to run for public office through a political party primary could enroll in the party as late as the day they file their nomination petitions. In this regard, the disaffiliation requirement is nondiscriminatory. *See Storer*, 415 U.S. at 733–34 ("The requirement that the independent candidate not have been affiliated with a political party for a year before the primary . . . . involves no discrimination against independents. Indeed, the independent candidate must be clear of political party affiliations for a year before the primary; the party candidate must not have been registered with another party for a year before he files his declaration . . . .").

In *Storer*, the Supreme Court upheld a restriction in California requiring members of political parties to disaffiliate one year before primary elections in order to run as Independents. *Id.* at 726. The disaffiliation requirement imposed here is considerably less severe, given that party members can disaffiliate from their party as late as the day they file their nomination papers.

The Sixth Circuit has held that an Ohio law requiring that "independent candidates claim on the day before the primary that they are not affiliated with any political party," does "not impose a severe restriction on candidates or voters, and . . . is merely a reasonable, nondiscriminatory regulation . . . ." *Jolivette v. Husted*, 694 F.3d 760, 767, 769 (6th Cir. 2012) (internal citation and quotation marks omitted). Similarly, the First Circuit has held that a Massachusetts requirement that independent candidates for "in-state office" be disaffiliated from political parties for at least ninety days before the primary election filing deadline for candidates running for the state senate, "places[s] little burden" on candidates. *McClure v. Galvin*, 386 F.3d 36, 42 (1st Cir. 2004).

33

Considering this persuasive authority, the Court finds here that the requirement that members of political parties disaffiliate from their party—as late as the day they file their nomination papers—in order to run as Independent candidates for public office in the general election is a "reasonable, nondiscriminatory restriction" that "places little burden" on candidates. *Jolivette*, 694 F.3d at 767; *McClure*, 386 F.3d at 42. Thus, the Court will consider whether Defendants have identified important interests which justify the modest burden the disaffiliation requirement places on registered and enrolled members of political parties. *Twin Cities*, 520 U.S. at 358.

Defendants assert that the requirement that members of political parties disaffiliate from their party in order to run for public office as Independent candidates in the general election addresses several important governmental interests. The interests identified by Defendants include preventing voter confusion; providing voters with accurate information about candidates; preserving the political party primary process; avoiding ballot congestion; and requiring political party members to make early plans to run as Independent candidates. (Dkt. No. 23 at 13–19).

Plaintiffs argue that the disaffiliation requirement does not address these concerns. With regard to voter confusion, Plaintiffs concede that "there is a state interest in avoiding confusion on a ballot," but argue that such an "interest is not implicated when Canegata's name will not appear on the same ballot under two different political designations." (Dkt. No. 24 at 18).[23] Defendants countered at the hearing on the instant Motion that voter confusion extends beyond confusion on the ballot. Defendants argued that, given the circumstances here, there would be confusion with regard to Plaintiff Canegata's political status as he is currently the Chair of the Republican Party and is running for that position again in August. According to Defendants,

---

[23] Plaintiffs explain that Canegata would appear on the Republican primary ballot in August as a candidate for chair of the party, and on the general election ballot in November as an Independent candidate for lieutenant governor.

given the small population of the Territory, voters in the general election in November would be aware of Plaintiff Canegata's membership in the Republican party, notwithstanding that he would only appear on the general election ballot as an Independent.

Dovetailing from this concern, Defendants contend that they have an interest in disseminating accurate information to voters regarding the political affiliation of candidates for public office. Defendants argue that listing a registered and enrolled member of a political party as "Independent" on the general election ballot is not only confusing for voters who know that the candidate is a member of a political party—in this case a high ranking office holder—it is misleading to other voters, who may desire to vote for a candidate who has no affiliation with a political party.

The Court finds persuasive Defendants' argument that the Virgin Islands has important and legitimate concerns regarding voter confusion and dissemination of accurate candidate information to voters, and that these concerns are addressed by requiring members of political parties to disaffiliate from their party before running for public office in the general election as Independents. As a preliminary matter, the Court finds fanciful the suggestion that confusion would be avoided because of a three-month gap between Canegata's appearance as a Republican on the primary ballot in his bid for re-election as chair of the Republican Party and his appearance as an Independent on the general election ballot in his bid for the office of lieutenant governor. The Court is equally unpersuaded by Plaintiffs' unsupported suggestion that the confusion should be ignored as beyond the purview of proper consideration because the inconsistent party status will appear on separate ballots.[24] Further, in addition to the confusion,

---

[24] Plaintiffs assert that "[i]f voter confusion exists outside of what appears on the ballot, that is an issue for the candidates and the electorate to address; but it is beyond the purview of the Supervisor of Elections under 18 V.I.C. § 411." (Dkt. No. 24 at 18). As discussed above, section 411 pertains to the Supervisor of Elections' duties with respect to examining nomination

the misleading nature of the inconsistency inherent in this dual political status is palpable. In short, the Court finds that Defendants have a legitimate interest in addressing both voter confusion and misleading information through the disaffiliation requirement at issue. *See Norman*, 502 U.S. at 290 (noting that states have an interest in preventing "misrepresentation and electoral confusion"); *Storer*, 415 U.S. at 732 (noting that a state is "free to assure itself that the candidate is a serious contender, truly independent, and with a satisfactory level of community support.") (footnote omitted); *Jolivette*, 694 F.3d at 769 (noting that "confusion" and "deception" are two problems which justify the state's interest in "regulating ballot access.") (citing *Schrader v. Blackwell*, 241 F.3d 783, 789 (6th Cir. 2001)); *McClure*, 386 F.3d at 43 (noting that a requirement which "provides some assurance that unenrolled candidates actually are independent of party affiliations" serves an important state interest); *MacBride v. Askew*, 541 F.2d 465, 468 (5th Cir. 1976) (holding that a state was justified in prohibiting the nominated candidates of the Libertarian party—who failed to qualify to be listed on the general election ballot as minor party candidates—from appearing on the ballot as independents, in part because "independents can claim a freedom from the ties [political parties] inherently create.").

Plaintiffs also contend that requiring members of political parties to disaffiliate before running in the general election as Independents does not address Defendants' concerns for preserving the political party primary process and avoiding ballot congestion. (Dkt. No. 24 at 15–16). Plaintiffs argue that, because party members can resign from their party as late as the

---

documents in order to determine their legal sufficiency. Plaintiffs fail to explain how this provision has anything to do with the Virgin Islands' interest in regulating its elections and limiting voter confusion. Further, Plaintiffs cite no authority for the proposition that a state's concern for voter confusion is somehow restricted to what is printed on the ballot itself and that any other confusion is left to the candidates and voters to address.

day they file their nomination papers, the disaffiliation requirement does nothing to protect the primary process or alleviate ballot congestion. (*Id.*).

To the contrary, Defendants argued at the hearing on June 27, 2014 that the law does in fact protect the primary process by requiring party members to make a choice. On the one hand, a party member may choose to run for public office in political primaries and maintain his or her party membership and the benefits that accompany it—such as the ability to vote in the party's primary, run for party offices, and truthfully assert that he or she is member of the party— knowing that if he or she emerges from the primary as the party's candidate for public office, he or she will be the officially sanctioned candidate of the party. On the other hand, a party member may disaffiliate from the party and proceed directly to the general election as an Independent (assuming he or she meets the requirements of Subchapter II for filing a nomination paper), without the benefits of party membership.

Defendants further argue that "[b]y requiring party electors who seek public office to go through the party primary [process], the Territory properly seeks to prevent the clogging of its election machinery, winnow out weak candidates, . . . and assure that the winner is the choice of a majority, or at least a strong plurality of electors." (Dkt. No. 23 at 18) (citing *Storer*, 415 U.S. at 7[3]4). Defendants contend that, were the disaffiliation requirement not enforced, upon party members' realization that they could forego the party primary process and go "directly to the general election ballot [while] maintain[ing] their party designation by merely submitting nomination papers under Subchapter II, it is obvious that the number of candidates on the general election ballot would increase as the primary would no longer be a tool for selecting the more credible candidates." (*Id.* at 18–19).

Here too, the Court finds Defendants' arguments persuasive. The Supreme Court has recognized that "States . . . have a strong interest in the stability of their political systems," and

that "the States' interest permits them to enact reasonable election regulations that may, in practice, favor the traditional two-party system, and that temper the destabilizing effects of party-splintering and excessive factionalism." *Twin Cities*, 520 U.S. at 366–67. Requiring political party members to make the decision to disaffiliate before running as Independent candidates has the natural effect of stabilizing the political party system by creating a distinction between political party candidates that emerge from the primary system, and Independent candidates. *See Jolivette*, 694 F.3d at 767 (noting that through its disaffiliation requirement, "Ohio seeks to maintain the integrity of its different routes to the ballot—the partisan primary and the independent petition.").

The Supreme Court has also noted that "a State has a legitimate interest in regulating the number of candidates on the ballot." *Bullock v. Carter*, 405 U.S. 134, 145 (1971) (citations omitted). The *Bullock* Court observed that "[a]lthough [the Court] ha[d] no way of gauging the number of candidates who might enter the primaries . . . if access to the ballot were unimpeded by the large filing fees in question, . . . [the Court] [was] bound to respect the legitimate objectives of the State in avoiding overcrowded ballots." *Id.* Similarly here, while it seems intuitive that the disaffiliation requirement would have some bearing on the number of candidates on the general election ballot, the exercise of predicting the effectiveness of the disaffiliation requirement in reducing ballot congestion would be pure speculation. Nonetheless, as in *Bullock*, the Court will defer to Defendants' reasonable approach to avoiding over-crowded ballots.[25]

---

[25] The Court notes Plaintiffs' assertion that, under the law, "[a] non-party candidate could join the Republican party the day after the nomination papers were filed and 'campaign as a Republican' to the public and defendants would have no argument that such a practice was improper.'" (Dkt. No. 24 at 8 n.6). Defendants responded at the hearing on the instant Motion that an Independent candidate for public office would be prohibited from enrolling as a political party member.

Finally, Plaintiffs argue that the prohibition against party members running as Independent candidates in the general election does nothing to address Defendants' concern with regard to requiring political party members to make early plans to run as Independent candidates because, as discussed, party members could disaffiliate the same day they file their nomination papers. The Court agrees with Plaintiffs on this issue. The disaffiliation requirement in no way compels party members to plan an Independent candidacy early. *Cf. Storer*, 415 at 735 (noting that the requirement that party members disaffiliate at least a year before primary elections in order to run as an Independent "works against independent candidacies prompted by short-range political goals, pique, or personal quarrel."). The Court's finding in this regard does not, however, alter its conclusion that Defendants have identified important interests, as discussed above, that justify the disaffiliation requirement at issue here.

In view of the foregoing, the Court finds that Defendants have identified important governmental interests—in the form of preventing voter confusion, disseminating accurate information to voters, preserving the political party primary process, and avoiding ballot congestion—that justify the reasonable, nondiscriminatory restriction that registered and enrolled members of political parties disaffiliate before running for public office in the general election as Independent candidates. *Wash. State Republican Party*, 552 U.S. at 452 ("[T]he State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions on election procedures.").

## 2.     Plaintiff Charles

Plaintiffs contend that requiring registered and enrolled members of political parties to disaffiliate before running for public office in the general election as Independent candidates restricts Plaintiff Charles' "fundamental" right "to vote for the candidate of his choice and the

right set forth in 18 V.I.C. § 381 to select a standard bearer." (Dkt. No. 2 at 10) (citing *Patriot Party*, 95 F.3d 253). Here, too, the Court finds no constitutional or statutory violation.

Plaintiff Charles' right to vote for the candidate of his choice, like most rights, is subject to certain limitations. *See, e.g.*, *Burdick*, 504 U.S. at 440 n.10 ("It seems to us that limiting the choice of candidates to those who have complied with state election law requirements is the prototypical example of a regulation that, while it affects the right to vote, is eminently reasonable.") (citation omitted). In fact, the Supreme Court has acknowledged that the twelve-month disaffiliation requirement in *Storer*—which the Court found did not violate the First and Fourteenth Amendment rights of the candidates themselves—did not infringe the First and Fourteenth Amendment rights of the disqualified candidates' supporters. *Anderson*, 460 U.S. at 792 n.12 (distinguishing *Storer* and noting that "[a]lthough a disaffiliation provision may preclude . . . ["independent-minded"] voters from supporting a particular ineligible candidate, they remain free to support and promote other candidates who satisfy the State's disaffiliation requirements.") (citing *Storer*, 415 U.S. 724).[26]

Accordingly, the Court finds that, because the reasonable, nondiscriminatory restriction that registered and enrolled members of political parties disaffiliate before running for public office in the general election as Independent candidates is justified by the important interests related to regulating local elections, discussed above, Plaintiffs Coffelt and Canegata's resulting disqualification does not violate Plaintiff Charles' First and Fourteenth Amendment rights.

---

[26] Based on the Court's finding that the disaffiliation requirement passes muster, both statutorily and constitutionally, there can be no violation of any rights that Plaintiff Charles may have under section 381.

## IV.   CONCLUSION

For the foregoing reasons, the Court will deny Plaintiffs' Motion for a permanent injunction and enter judgment for Defendants. An appropriate Order accompanies this Memorandum Opinion.

Date: July 7, 2014                              _____/s/_____
                                                WILMA A. LEWIS
                                                Chief Judge